UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------:

SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                        Plaintiff,           :
                                             :
            v.                               :          12 Civ. 8167 (RJS)
                                             :
LEE COLE, et al.,                            :          ECF Case
                                             :
                                             :
                        Defendants.          :

------------------------------------------------------------------------------:


PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT AGAINST
DEFENDANT TIMOTHY QUINTANILLA


Aaron P. Arnzen, Senior Trial Counsel
SECURITIES AND EXCHANGE COMMISSION
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
415-705-2460
arnzena@sec.gov

Stephen A. Larson, Senior Counsel
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Room 400
New York, NY 10281-1022
(212) 336-0142
larsonst@sec.gov

Attorneys for Plaintiff


April 29, 2014

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT                                                           1

BACKGROUND                                                                      3

I.      Financial Statements and Audits                                        3

II.     Electronic Game Card, Its Financial Statements, and Management Disputes   4

III.    Mendoza Berger & Co.                                                   5

IV.     Quintanilla and MB's Audit Reports                                    6

V.      Quintanilla's Sure-to-Fail Audits                                     9

VI.     Quintanilla's Decision to Ignore Clear Indications of Fraud for Several
        Financial Statement Accounts                                          13

        A.      Cash                                                          13
        B.      Revenues and Accounts Receivable                              17
        C.      Taxes                                                         20
        D.      Shareholders' Equity                                          21

VII.    Quintanilla's Expert Concedes a Full Range of Violations of PCAOB Standards   21

VIII.    Quintanilla Received a Share of Audit Fees Paid by EGMI              22

THE SUMMARY JUDGMENT STANDARD                                                  23

ARGUMENT                                                                       23

I.      Quintanilla Violated Section 17(a) of the Securities Act, Section 10(b)
        of the Exchange Act and Rule 10b-5 Thereunder.                        23

        A.      Quintanilla Made Materially False Statements to the Investing Public.   24
        B.      Quintanilla Engaged in a Scheme to Defraud.                   25
        C.      Quintanilla Obtained Money or Property by Means
                of His Untrue Statements.                                     26
        D.      Quintanilla Exercised Authority over Mendoza
                Berger's Audit Reports.                                       27
        E.      Quintanilla Acted with the Requisite State of Mind.          27

        F.      The Evidence Establishes the Remaining
                Elements of Securities Fraud                                  29

II.     Quintanilla Aided and Abetted Mendoza Berger's Violations of
        Section 10(b) of the Exchange Act.                                  30

III.    Quintanilla Aided and Abetted Mendoza Berger's Violations of
        Sections 10A(a)(1) and 10A(b)(1) of the Exchange Act.               31

        CONCLUSION                                                          31

TABLE OF AUTHORITIES

Page

CASES

*In re Fannie Mae* 2008 Sec. Litig., 891 F.Supp.2d 458 (S.D.N.Y. 2012)   26

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)   22

*Pfizer Inc. Sec. Litig.*, 936 F.Supp.2d 252 (S.D.N.Y. 2013)   26

*SEC v. 800america.com, Inc.*, 2006 WL 3422670 (S.D.N.Y. 2006)   29

*SEC v. KPMG*, 412 F.Supp.2d 349 (S.D.N.Y. 2006)   26-27

*SEC v. Pentagon Cap. Mgmt., PLC*, 725 F.3d 279 (2d Cir. 2013)   23, 24

*SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978)   23

*SEC v. Price Waterhouse*, 797 F.Supp. 1217 (S.D.N.Y. 1992)   3

*See SEC v. Ramoil Mgmt., Ltd.*, 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007)   29

*SEC v. Softpoint, Inc.*, 958 F.Supp. 846 (S.D.N.Y. 1997)   29
*SEC v. Syron*, 934 F.Supp.2d 609 (S.D.N.Y. 2013)   25, 29

*SEC v. Tourre*, 2014 WL 61864 (S.D.N.Y.)   24

*U.S. v. Naftalin*, 441 U.S. 768, 773, 778-79 (1979)   29


STATUTES

Securities Exchange Act §10(b) and Rule 10b-5 thereunder   *passim*

Securities Act §17(a)   *passim*

Securities Exchange Act §20(e)   30-31

FRCP 56   22

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this memorandum of law in support of its summary judgment motion as to all of its claims against defendant Timothy Quintanilla except the claim for primary liability under Section 10A of the Exchange Act.

## PRELIMINARY STATEMENT

Defendant Quintanilla's purported audits of Electronic Game Card, Inc.'s ("EGMI's") 2006, 2007, and 2008 financial statements were shams. ***His own expert witness concedes that Quintanilla failed to meet the Public Company Accounting Oversight Board's ("PCAOB's") overarching planning, fraud review, evidential matter, supervision, proficiency, quality control, and documentation standards on the EGMI audits.*** The same expert does <u>not</u> dispute the vast majority of the additional PCAOB standards violations detailed in the SEC expert witness's report. Given the conceded and massive audit failures at issue here, there can be no reasonable dispute that Quintanilla was negligent when he caused his CPA firm – Mendoza Berger & Co. ("MB") – to issue reports falsely stating that MB's audits complied with PCAOB standards and that EGMI's financial statements were accurate. Quintanilla therefore violated Section 17(a) of the Securities Act.

Having established the falsity of MB's unqualified audit reports, the decisive question on the SEC's fraud claim under Section 10(b) of the Exchange Act surrounds Quintanilla's state of mind. Specifically, (1) did Quintanilla know, or was he reckless is not knowing, that MB's audits did not meet PCAOB standards; and/or (2) did Quintanilla recklessly, and without a meaningful basis, state that EGMI's financial statements were fairly presented? And while it is not every day that courts answer "yes" to such scienter questions at the summary judgment phase, this is not your everyday audit fraud. ***The indisputable evidence shows that Quintanilla acted with scienter.***

***First, Quintanilla engaged in a classic cover up.*** Right after he received notice that the PCAOB would be inspecting MB's EGMI audit files (and several months after the 2008 audit report was issued), Quintanilla led an effort to supplement, modify, and backdate the related audit workpapers – all to create the false impression that there was at least some measure of support for his clean audit reports. Quintanilla engaged in and directed this cover up – a major violation of the PCAOB's documentation standards in its own right – because he knew his previous work supporting the EGMI audit opinions did not meet PCAOB standards.

***Second, Quintanilla's repeated and "egregious refusal to see the obvious [and] to investigate the doubtful" is strong evidence of scienter.*** *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992). Time and again, Quintanilla ignored obvious signs of fraud in EGMI's accounting for critical aspects of its financial performance and condition, including its cash, accounts receivable, revenue, tax liabilities, and stockholders' equity.

***Third, a number of people surrounding Quintanilla, including very junior auditors, immediately spotted signs of EGMI's fraud and/or huge shortcomings in his audits.*** A junior auditor took one look a bank statement that EGMI provided to Quintanilla in Microsoft Word format and asked herself: "[I]s this really what you [EGMI] received from Credit Suisse? Or did you make this?" She took her concerns to Quintanilla, who did next to nothing in response. Another auditor - aware that the audit team had not conducted a full audit - challenged Quintanilla when he gave EGMI approval to file its fiscal 2007 financial statements with a clean audit opinion. Yet another junior auditor recounted in an email to Quintanilla's partners that he "had brought up to Tim [Quintanilla] that the client was sketchy …. We were worried during the audit that there may be a misappropriation of assets and have also found very little outside information on their customers to substantiate if any of their customers even exist." In addition, relying largely on documents he obtained from Quintanilla and within just months of joining the company, a new

2

CFO at EGMI raised a long list of serious concerns about EGMI's financial reporting and disclosures.

Standing alone, and certainly in combination, these facts lead to a single, irrefutable conclusion: Quintanilla knew or was reckless in not knowing that MB's statements that it followed PCAOB standards were false, and he knew that he had no basis to opine that EGMI's financial statements squared with GAAP.

The same evidence leaves no room for any reasonable dispute that (1) Quintanilla aided and abetted his firm's fraudulent issuance of the false EGMI audit reports, and (2) aided and abetted his firm's violations of Sections 10A(a)(1) and 10A(b)(1) of the Exchange Act when he failed to respond to clear indications of illegal conduct at EGMI.

## BACKGROUND

### I.   <u>Financial Statements and Audits</u>

Quintanilla's audits were part of a statutory and regulatory scheme devised "[t]o protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws." Preamble to Sarbanes-Oxley Act of 2002. Public companies are required to file their financial statements and related disclosures with the SEC, which in turn makes those filings public. *E.g.*, Section 13 of the Exchange Act. Financial statements are important to investors because the statements provide robust information about a company's financial condition and performance, are prepared under well-known standards (Generally Accepted Accounting Principles, or "GAAP") that facilitate comparison with other investment options, and include footnotes for narrative elaboration on the numeric information presented in the statements themselves. *See* SEC Regulation S-X (17 C.F.R. § 210). Financial statements filed with the SEC must be accompanied by an auditor's opinion based on an audit conducted pursuant to standards set by the PCAOB. *Id.* at § 210.2-02. GAAP establishes how to reflect economic events on a company's financial statements, while PCAOB

standards (preceded by Generally Accepted Auditing Standards, or "GAAS") establish how an independent auditor should test the accuracy of those financial statements.

One of the key concepts incorporated into PCAOB standards concerns risk – primarily, the risk that the financial statements being audited are materially misstated. (¶39.[1]) Under the standards, auditors should respond to perceived risks – be they risks assessed at the beginning of an audit or risks that become apparent during the course of the audit – by using enhanced and/or additional audit procedures. (*Id.*) In other words, if there is a high risk that a particular account may be materially misstated, the auditor should take extra steps to audit the account, and closely scrutinize the results of those steps. (*Id.* at 5.)

## II.     Electronic Game Card, Its Financial Statements, and Management Disputes

EGMI, a Nevada corporation with offices in New York and London, purported to make credit card-sized electronic games that could be sold by lotteries as alternatives to scratch-off tickets. (¶¶1-3.) As CEO and CFO, Lee Cole and Linden Boyne controlled all aspects of EGMI's operations and finances from at least 2006 through early 2009, during which time they perpetrated a massive financial statement fraud on the investing public. (¶¶5-6.) EGMI's financial statements falsely portrayed a company with high and steadily increasing cash balances, revenues, income and overall assets. (¶8.) Then, leveraging this supposed commercial and financial success story, Cole and Boyne used a network of companies they secretly controlled to illegally sell EGMI common stock to the investing public at inflated prices. (¶9.)

In early 2009, a wealthy British investor, Lord Leonard Steinberg, acquired sufficient EGMI stock to become the company's executive chairman, and attempted to relocate the company's primary operations to Irvine, California and replace Cole and Boyne with a U.S.-based management team consisting of, *inter alia*, CEO Kevin Donovan and CFO Thomas Schiff. (¶¶10-13.) Cole and

---

[1] Unless otherwise noted, all citations to ¶ are to the SEC's Statement of Undisputed Facts, submitted herewith.

Boyne resisted this transfer of corporate power mightily because they did not want their fraud uncovered. (¶¶14.) They refused to provide most of the company's meaningful documents to the U.S.-based team, and failed to answer repeated, basic inquiries about EGMI's operations, customer base, and financial condition. (*Id.*) Tensions quickly came to a head after Schiff started as CFO in August 2009 and got his first look at Cole and Boyne's nonsense. Within several weeks, and without much information beyond what could be gleaned from documents he received from MB, Schiff began raising serious concerns about, *inter alia*, the integrity of Cole and Boyne and the accuracy of EGMI's financial disclosures concerning its outstanding stock, revenues, accounts receivable ("A/R"), income taxes, and stockholders' equity. (¶¶15-20.) His concerns only increased over time – every answer he was given "merely led to more questions." (¶16 .)

Once Schiff started pulling on the strings, Cole and Boyne's story quickly unraveled. By October 28, 2009, Schiff reported significant issues to the head of EGMI's audit committee and stated that "[t]his has been like working with a jigsaw puzzle – with pieces missing." (¶18.) The next day, he sent an email calling many of the same issues "huge red flags." (¶19.) Schiff also made notes regarding an October 29, 2009 meeting with Cole and Boyne about, *inter alia*, funds transfers, and concluded Boyne "WAS OBVIOUSLY NOT TRUTHFUL IN WHAT HE TOLD ME" about the transfers. (¶20 (emphasis original).) In January 2010, Credit Suisse-Gibraltar ("CS") told EGMI's new management team that the company's purported account at the bank (which, according to Cole and Boyne, held an enormous cash balance) was "not an account for EGMI." The letter also reported that EGMI did at one time have an account at Credit Suisse, but "that no assets were ever received" into it. (¶21.) Shortly thereafter, on February 12, 2010, the MB partner who took over the EGMI engagement after Quintanilla left the firm withdrew all of MB's prior audit opinions for EGMI. (¶22.) On May 18, 2010, EGMI gave investors notice that "its financial statements for the years ended December 31, 2006, 2007, and 2008 should no longer be relied upon." (¶23.)

### III.   <u>Mendoza Berger & Co.</u>

At Quintanilla's direction, MB – a Southern California accounting firm and PCAOB registrant – issued the audit reports central to this case. (¶24.) Since at least 2006 and as Quintanilla's own expert witness has acknowledged, MB functioned as "a mill" that was more concerned with churning out clean audit opinions than conducting professional audits. (¶25.) In 2012, the firm filed for bankruptcy protection and ceased operations. (¶26.)

### IV.   <u>Quintanilla and MB's Audit Reports</u>

Quintanilla graduated from the University of Southern California with a bachelor's degree in business administration in 1991 and, after several years of practice and passing a notoriously rigorous uniform examination, obtained his CPA license in California in 1995. (¶¶27-28.) Quintanilla joined MB as one of its three audit partners in 2006. (¶29.) At MB, Quintanilla claimed to have:

> [O]ver 15 years of experience in accounting, auditing and consulting with all types of entities in the private, public and government sectors. Mr. Quintanilla's previous tenure includes serving as an Audit Partner with a local firm and as an Audit Manager with Price Waterhouse. … ***His core competencies are in the area of audits, reviews and compilations of both closely held and public companies***. … His experience ranges from dealing with large SEC reporting corporations to small locally owned companies. (¶30.)

Quintanilla brought a number of audit clients with him to MB, including Advance Nanotech, Inc., one of several public companies operated by Cole and Boyne. (¶32.) Based on his work on Advance Nanotech, Boyne contacted Quintanilla in or around August 2006 to audit EGMI's 2006 financial statements. (*Id.*) Quintanilla continued as MB's engagement partner on the 2007 and 2008 audits. (¶33.) As engagement partner, Quintanilla concedes that the EGMI audit reports "signed by Mendoza Berger wouldn't have been signed by Mendoza Berger had it not been for [him]" and, in his answer to the complaint, Quintanilla "admits" that he "supervised and signed off on EGMI's audits." (¶¶34-35.) In other words, Quintanilla was the auditor with "final responsibility" (as that

term is used in the PCAOB standards) for supervising the EGMI audits and ensuring that he and his audit team met PCAOB standards. (¶36.)

Despite the fact that EGMI's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 were fraudulently misstated, Quintanilla caused MB to issue unqualified, "clean" audit reports. (¶¶37.) Those audit reports made three, closely related representations: "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board"; "[w]e believe that our audits provide a reasonable basis for our opinion," and "[i]n our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of [EGMI] … in conformity with accounting principles generally accepted in the United States of America." (¶¶38.)

## V.   <u>Quintanilla's Sure-to-Fail Audits</u>

By stating that the audits were performed in accordance with PCAOB standards, MB effectively represented to the investing public, *inter alia*, that it: (1) planned the audit to "develop[] an overall strategy for the expected conduct and scope of the audit" in light of assessed risks (¶39(a)-(b)); (2) took affirmative steps "to identify the risk of material misstatement due to fraud" and tailored its audit procedures to determine whether fraud was afoot (¶¶39(c)-(e)); (3) gathered sufficient "evidential matter" to determine whether the financial statements were fairly stated (¶¶39(f)); (4) ensured the audits were performed by people with "adequate technical training and proficiency as an auditor" (¶39(g)); (5) ensured that "assistants [were] properly supervised" (¶39(h)); (6) assembled audit documentation to serve as "the written record of the basis for the auditor's conclusions" (¶39(i)); (7) obtained clearance from a concurring partner who performed a substantive quality control review of Quintanilla's audit work and conclusions (¶39(j)); and (8) throughout these efforts, exercised "due care" and "professional skepticism" (¶39(k)).

***Quintanilla's own expert witness concedes that he failed to meet each and every one of these standards on the EGMI audits***. While striking at first blush, these conclusions are obvious given the range of Quintanilla's violations.

Planning - Quintanilla's expert testified that MB's "planning was deficient but not nonexistent. It is planning that perhaps in a private company audit might have been appropriate but certainly not in an international company such as Electronic Game Card." (¶41.)

Fraud Review, Professional Skepticism – Quintanilla's expert testified that MB did not "comply with PCAOB [standards] by taking adequate steps to identify the risk of material misstatement due to fraud." (¶42.) The audit standards require auditors to review for fraud and, if they encounter fraud indicators, ratchet up their audit procedures for greater scrutiny. (¶¶39(c)-(e).) Further, according to AU 316.13,[2] "[b]ecause of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence." (¶¶39(e).) As discussed at length below, Quintanilla encountered fraud indicators casting doubt on several critical aspects of EGMI's financial statements, but there is no evidence that he viewed them with professional skepticism, performed additional audit procedures, or subjected those areas to increased scrutiny. For example, even though several red flags flapped around EGMI's supposed bank account at Credit Suisse, Quintanilla did not even apply the level of scrutiny and conduct the audit procedures to which he committed *before* the red flags were spotted, much less conduct extended or additional procedures. (¶¶120-121.)

Evidential Matter - Quintanilla's expert opined that MB did not "comply with PCAOB standards … in terms of gathering sufficient evidential matter to determine whether the financial

---

[2] This brief utilizes "AU __" as the abbreviation for sections within the Codification of Accounting Standards and Procedures, American Inst. Of Certified Pub. Accountants, as is the practice within the accounting industry.

statements were fairly stated." (¶45.) The team performed absolutely no fieldwork for the 2006 or 2007 audits. (¶46.) Fieldwork – *i.e.*, going to the client's offices, interacting with and questioning management, obtaining a first-hand understanding of the client's business, books and records, accounting systems, etc. – forms the backbone of virtually all *bona fide* financial statement audits. (¶47.) Auditing by telephone and email frequently left the audit team requesting documents and supporting materials even after EGMI filed its financial statements. (¶48.) Often, the client never supplied such supporting materials. (*Id.*)

Supervision and Proficiency - All three of the purported EGMI audits were exceptionally understaffed. (¶¶49-58.) Quintanilla's expert testified that MB failed to "comply with PCAOB standards in order to ensure that the audits were performed by people with adequate technical training and proficiency as an auditor." (¶50.) The only experienced staff member on the team challenged Quintanilla when he authorized a clean audit report on EGMI's 2007 financial statements. Quintanilla provided no response. (¶56.) The "lead staff" on the 2008 audit was a junior auditor who had only two years of relevant experience and did not have his CPA license. (¶54(c).) Even though he was "stretched thin," "always overworked," and saddled with so many responsibilities for other clients that "[i]t would have been difficult for anyone to get all that [work] done," this "lead staff" had to pick up slack from another junior auditor (whose employment may have been terminated during the audit, and who also had minimal experience and no CPA license). (*Id.*; *see also* ¶¶57-58.) Finally, Quintanilla's own expert believes that Quintanilla was woefully unqualified to conduct the 2006, 2007, and 2008 audits, *i.e.*, "he did not have the experience and skill set necessary to do the audits of Electronic Game Card." (¶52.)

Documentation – Quintanilla's expert testified that MB failed to "comply with professional standards established by the PCAOB in terms of obtaining clearance from a reviewing partner who performed a substantive review of the audit work and conclusions." (¶59.) Under PCAOB standards

and within 45 days of issuing an opinion, auditors should prepare workpapers that serve as the "the written record of the basis for the auditor's conclusions." (¶39(i).) Auditors should clearly document and explain any modifications they make to the workpapers after this 45 day period. (*Id.*) Quintanilla's EGMI workpapers do not support his clean audit opinions, and provide no indication of how the audit team tested EGMI's accounting or responded to red flags identified during the audits and reviews. (¶60.) There is also direct evidence that Quintanilla recognized these failures and tried to cover them up by backdating and modifying the workpapers months after issuing the 2008 opinion and shortly before a PCAOB inspection took place. (¶¶61-71.) What's more, in order to create workpapers that would fool the PCAOB inspectors, he and his team had to take special actions and precautions to fool MB's audit software.  Describing the actions necessary to backdate workpapers, a MB staffer testified that "[y]ou have to change the date in computer first to be able to backdate [an audit workpaper] correctly. … So you have to change – close the [audit software program used by MB], backdate your computer."). (¶70.) Quintanilla was aware of these methods MB used to backdate workpapers. (*Id.*)

<u>Concurring Partner Review</u> – In the face of a clear mandate to the contrary, Quintanilla failed to have a concurring partner perform a quality control review on his audit work and the support for his conclusion. (¶¶73-76.) James Berger was nominally the concurring partner on the EGMI audits. (¶74.) However, as Quintanilla's expert concedes, Berger "didn't do any work, as far as I could tell, until it was too late." (¶75.) "Indeed, Mr. Jim Berger's comments regarding what more or else could have or should have been done appear nowhere until after the Mendoza Berger firm pulled its audit opinions in February 2010 and after Mr. Tim Quintanilla left the Mendoza Berger firm." (¶76.)

* * *

Given these enormous failures, the end result – an "audit" that missed a long-standing, massive fraud despite three "audits" and nine interim "reviews" – was a foregone conclusion. Even

10

so, Cole and Boyne were particularly bad liars, and covered the waterfront with red flags that even Quintanilla's sure-to-fail audit process couldn't help but notice. Nevertheless, MB did not respond to extraordinarily obvious indications that a variety of accounts and many other aspects of its financial statement were misstated.

**VI.    Quintanilla's Decision to Ignore Clear Indications of Fraud for Several Financial Statement Accounts.**

**A.    Cash**

EGMI reported 2006, 2007, and 2008 year-end cash balances of $3.0M, $4.8M, and $9.2M, respectively. (¶¶.) According to Cole and Boyne, most of this cash resided in an account held at Credit Suisse ($2.7M, $3.4M, and $8.3M, respectively). (¶¶82.) This account purportedly held between 71% and 91% of EGMI's total assets at these year-ends. (*Id.*) The CS account was also important insofar as it supposedly served as EGMI's operating account. (¶83.) Because EGMI's revenues were received into this account and expenses paid out of it, activity in the account would be expected to affect almost every single line item on EGMI's other financial statements and, therefore, *"[i]f you can't properly audit cash," you can't "properly audit any aspect of the financial statements."* (¶85.) Despite all of this, Quintanilla failed to follow up on huge red flags surrounding the account.

2006 – MB had **no** independent evidentiary basis to opine on the accuracy of EGMI's claim that it maintained a huge cash balance in the CS account. (¶¶86-88.) The audit team asked for, but did not obtain, a bank statement and reconciliation for the CS account – a universal and exceptionally obvious first step in auditing cash. (¶86.) The team did obtain a confirmation of the account's balance (in the form of a fax purportedly sent by CS), but they didn't receive it until *after* the audit opinion was issued. (*Id.*) Further, the confirmed balance ($2,708,107.65) did not match the account's balance as reported in EGMI's general ledger (the company's central accounting system) ($3,030,107.65). (¶90.) Nobody on the audit team looked into the $322,000 difference, even though the audit's materiality threshold (as set by the audit team) was $51,000. (¶¶77, 90.) What's more, the

confirmation was faxed to MB. (¶89.) The audit standards are clear that auditors should be skeptical and wary of additional audit risk when presented with faxed confirmations; MB did not take or consider any audit steps to address such risks.  (¶¶91-92.)

The audit team did get the bank statements and reconciliations for two (much smaller) cash accounts that EGMI held at Bank of America (BofA) and Clydesdale Bank, but those just raised more red flags. (¶¶93-105.) EGMI's general ledger (which was prepared by EGMI employees or agents and included in MB's workpapers) recorded multiple large transfers, in round dollar amounts, between the smaller cash accounts and the purported CS account.  The BofA and Clydesdale statements, however, demonstrate that those general ledger entries were highly suspect and likely false because they show that these transfers were actually between the BofA and Clydesdale accounts and other, *off-balance sheet bank accounts* held by entities related to Cole and Boyne, *i.e.*, *not* the CS account. (*Id.;* for specific example, *see* ¶¶94, 99-100.) Among the obvious conclusions that Quintanilla failed or refused to acknowledge: EGMI's accounting records and financial statements reflecting the CS account were wrong; the audit team needed answers to serious questions about the CS account; EGMI had cash inflows and outflows that were not recognized in its financials; and EGMI had undisclosed related party transactions. Without any explanation or scrutiny of these transfers, the MB engagement team signed off that it scanned cash receipts and disbursements for significant or unusual transactions near year end. (¶¶104-105.) This occurred even though audit standards mandate that auditors scrutinize journal entries occurring near year end and/or contain round numbers for fraud. (¶93.)

2007 – The audit failures surrounding cash in 2007 are a replay of those in 2006. (¶¶106-109.) Once again, (1) the audit team failed to obtain a bank statement or reconciliation for the CS account (¶¶16-108), (2) the team relied on a faxed CS confirmation without addressing the risks highlighted in the audit standards (*i.e.*, the risk that the fax didn't really come from CS) (¶¶109-110);

and (3) EGMI's general ledger (found in MB's workpapers) showed transfers between Clydesdale and BofA on the one hand and CS on the other, while the Clydesdale and BofA accounts (also found in the workpapers) showed those transfers were really to/from other, off-balance sheet accounts, some of which belonged to Cole/Boyne-related entities. (¶¶111-118.) There is no evidence in the audit workpapers that Quintanilla did anything to investigate these huge red flags. (¶119.)

2008 – The audit team did slightly more work in 2008, but that extra work should have sounded more alarm bells with the audit team, rather than provide comfort. (¶¶120-130.) For the first time, the team documented a "risk assessment" concerning EGMI's cash account. It determined the "risk of material misstatement" of cash on the financial statements was "high" and, therefore, decided to perform "extended procedures." (¶120.) Without explanation, though, the team did not apply such extended procedures, which Quintanilla admits. (¶121.)

Also for the first time, the team obtained a purported bank statement for the CS account, but it raised giant red flags: (1) although CS was supposed to be EGMI's operating account, used to pay expenses and receive revenues, the statement does not report any activity in the account; (2) apparently due to a simple mathematical error, the only three numbers on the statement do not add up (those numbers did add up on statements MB received for other periods); and (3) the formatting and punctuation are amateurish and highly suspicious. (¶122.)

In addition to these new red flags, and just like in 2006 and 2007, the team relied on a faxed CS confirmation without taking steps to address related audit risks (¶¶123-124), and failed to obtain an explanation or justification for a $589,000 journal entry (which, without any basis, adjusted the cash balance in EGMI's accounting books and financial statements). (¶¶125-128.) The team's cash risk assessment (already high at the outset of the 2008 audit) should have gone through the roof when they received this audit evidence, yet no additional or extended audit procedures were performed on cash. (¶¶120-121.)

13

_2009_ – Quintanilla also led MB's quarterly interim reviews of EGMI's financial statements, during which he encountered another type of red flag. While conducting the Q2 2009 review, the lead staff on the engagement received an email directly from EGMI – not the bank – attaching a _CS bank statement in Microsoft Word_ format. (¶131.) A copy of the statement appears in the workpapers without explanation or evidence of any additional audit scrutiny. (¶¶132-133.) Then, during the third quarter review, Boyne emailed Quintanilla _another_ CS bank statement in MS Word format. (¶134.) When notifying Schiff (the new CFO on EGMI's U.S. management team) that he had finally received the statement, Quintanilla noted for Schiff the obvious peculiarity of it being in Microsoft Word format, writing "I'll send the CS statement next, which is in Word format, oddly enough," (¶138.) Receiving the CS bank statement in Microsoft Word caused Schiff "to question whether the Credit Suisse bank statement was accurate," "whether it was authentic," whether "it actually came from Credit Suisse," and "whether the company had all of the cash that it reported that it had." (¶141.)

When Quintanilla forwarded the .doc statement to a team member (and very junior auditor), she noticed the format "right away" and testified that she could "actually press the logo with your mouse and drag it around when you opened the document," and was therefore "extremely confused." (¶¶135-136.) She asked herself, "[I]s this really what you [EGMI] received from Credit Suisse? Or did you make this?" (¶135.) It took this junior auditor no time to conclude that it was "not a valid document. If it really -- the original source is a Microsoft Word document, then it does not -- it was not a bank statement." (_Id._) She took her observations to Quintanilla, who could only manage this in response: "Oh, isn't that weird? Yeah, you should ask Tehseen [Mehmood, EGMI's bookkeeper] what's going on." (¶137.) The MB audit team considered requesting a copy of the CS bank statement from EGMI in .pdf format, even though "all [a person at EGMI would] have to do is print it [the Word version] out, scan it, and send you a PDF." (¶139.) In the end, Quintanilla

simply requested that Boyne "forward the Account activity statement [*i.e.*, a document generated by EGMI] for Credit Suisse as well for September and October." (¶¶139-140.) As discussed above, when auditors become aware of possible fraud, audit standards mandate that they obtain additional evidence, consider implications on other aspects of their audits, and determine whether the information impacts their opinions on previously issued financial statements. Quintanilla did none of these things: there is no evidence that he contacted CS, conferred with his concurring partner, retracted his opinions on EGMI's prior financial statements, or took any further actions to address this giant red flag. (¶140.)

In addition, Quintanilla and Tillotson admit that MB documented basic audit steps surrounding the CS account that could not have been performed unless MB had a CS bank statement that reported individual deposits and withdrawals into that account. (¶¶127.) MB never received such a statement. This omission was obvious, and no relevant witness has provided a valid explanation for how MB was able to document work that it could not have performed.

### B.  Revenues and Accounts Receivable

Revenue and A/R are interrelated financial statement line items, and the audit of either account typically bears on the audit of the other. Revenues (which appear on the income statement) represent how much an entity has earned from delivering or producing goods or rendering services. (¶142.) Accounts receivable (which appear on the balance sheet) represent the cash flow that has not yet been collected from previous sales. (*Id.*)

2006 - Just like the CS bank account in 2006, the audit team had *no independent evidentiary basis* to opine on the highly material revenue and A/R accounts reported on EGMI's financial statements. (¶¶145-148.) Under PCAOB standards, an "auditor should ordinarily presume that there is a risk of material misstatement relating to revenue recognition," and "there is a presumption that the auditor will request the confirmation of accounts receivable during an audit." (¶144.) Such confirmations

consist of asking independent third parties to verify the terms and status of transactions with the financial statement issuer/client. (*Id.*) "An auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame this presumption." (*Id.*) Consistent with this mandate, the MB team's audit program called for obtaining audit confirmations for selected EGMI accounts and a number of additional procedures concerning A/R. (¶146.) *Despite this, there is no evidence that the team sent a single request for confirmation of an accounts receivable balance (or received such a confirmation) during the 2006 audit.* (¶¶147-148.) Just as troubling, apart from initials of an audit team member that were typed in the applicable audit program (which are of dubious evidentiary value, for reasons discussed below), the workpapers document only that MB obtained and perhaps perused a list of aged outstanding A/R balances for year-end 2006, that were supplied by the client. (¶¶146-148.) This EGMI-provided list was not independent audit evidence and there is no substantive documentation that the audit team performed any of the other steps they set out for themselves in their audit program.  (*Id.*)

2007 – MB's audit of revenue and A/R in 2007 also violated PCAOB standards, and was only slightly better than 2006. (¶¶149-153.) The team set out to confirm all six EGMI customers with outstanding balances at year-end. (¶¶.) MB represented in its workpapers that it received three confirmations of those balances from EGMI customers, representing just 34% of the $2.3 million dollar account balance the team sought to confirm. (¶¶.) One of those confirmations was highly suspicious – (1) the confirmation was sent to a customer supposedly *located at EGMI's own address in London* (no related party transactions were disclosed in the financial statements), and (2) the customer that confirmed the balance purported to verify the balance owed by an entirely different customer, and not its own. (¶152.)

2008 – During audit planning for the 2008 EGMI audit, MB determined that there was a "medium" to "high" "risk of material misstatement" of A/R and sales (a "Significant Audit Area")

and concluded that "extended" audit procedures were necessary to audit those accounts. (¶154.)
During the audit itself, a junior auditor noticed that many of EGMI's "invoices sent to various
clients included identical terms and that those clients were clustered at two addresses in Gibraltar."
(¶155.) After raising the issue with Quintanilla, he and Quintanilla then unsuccessfully looked for
information about these customers on the internet. (¶156.) The junior auditor later reported that
they "found very little outside information on their customers to substantiate if any of their
customers even exist." (¶157.) Moreover, the audit team sought to confirm balances due from all of
EGMI's customers, but three of the customers, with cumulative outstanding balances representing
32% of the year-end A/R balance, did not reply to MB's confirmation request. (¶158-160.) To
confirm the balances purportedly owed by those three customers, the team relied solely on materials
that, on their face, were generated and supplied by EGMI – that is to say, *the team simply matched data
from EGMI's accounting system to data from EGMI's accounting system*. ¶161.) So, at the end of the day, the
team performed no independent verification on one third of EGMI's A/R balance. The team did so
despite its own high risk assessment, its decision to apply extended audit procedures, and red flags
arising from Quintanilla's inability to "substantiate if any of [EGMI's] customers even exist."
(¶¶155-157.)

Lastly, the confirmations that the audit team did receive back from other customers were
variously denominated in U.S. dollars and British pounds. (¶¶162-163.) However, the audit team
added the invoice amounts denominated in dollars to invoice amounts denominated in pounds,
*without conversion*, to impossibly "verify" the total dollar amount of A/R reported in EGMI's general
ledger system. (*Id.*) EGMI's general ledger system was maintained in British pounds, which is
apparent on the face of documents produced by the system. (*Id.*) Yet, without any foreign currency
conversion, the total amount of A/R reported in British pounds matches the total A/R reported in
EGMI's financial statements included in its Form 10-K, which are reported in U.S. dollars. (*Id.*) *In*

*other words, MB confirmed the accuracy of EGMI's reported A/R balance by adding pounds and dollars together to*

*get a total in pounds, and then matched this amount to a dollar-denominated figure reported in EGMI's financial*

*statements, all without any conversion.*

### C.    Taxes

EGMI *did not file any federal or state tax returns in the U.S.* from at least 2002 through 2009. (¶¶168-169.) Nevertheless, EGMI claimed in its 2008 Form 10-K that the company "is subject to income taxes in the United States of America, United Kingdom, and the state of New York. As of December 31, 2008, the Company had a net operating loss carry forward for income tax purposes of approximately $11,945,052 in the United States … that may be offset against future taxable income through 2023." (¶164.) Similar statements appear in EGMI's 2006 and 2007 Forms 10-K. (¶¶165-166.) It is all but impossible to come up with specific numbers like this without filling out the applicable tax forms and performing the related calculations, which EGMI did not do. (¶173.)

EGMI's failure to file tax returns renders its disclosures misleading and casts serious doubt on its accounting and the integrity of its management. When Schiff learned in August 2009 of EGMI's failure to file tax returns for several years, he was very concerned. "This is a serious matter on multiple levels: … a reasonable person, or investor, would infer from our tax disclosures that returns have been filed: we disclose NOL's [net operating losses]; talk about taking tax positions; and making judgments and interpretations under tax laws. I need to bring this matter to the board's attention." (¶170.) Quintanilla testified that he did not disagree with Schiff's assessment (¶172), and acknowledged that EGMI "was reporting NOLs on its financial … statements … but it had no right to those NOLS if it didn't file the tax returns. (¶174.) Failure to file tax returns presumably is also a criminal offense.

Under those circumstances, how could Quintanilla issue a clean audit opinion? Perhaps he learned that EGMI failed to file its tax returns only after issuing his audit reports? Not so.

Quintanilla discovered much earlier, in January 2009 (before MB's audit field work on EGMI's financial statements even began), that EGMI had not filed the subject tax returns. (¶¶.) Indeed, EGMI engaged MB in January 2009 to prepare the delinquent returns. (¶168-169.) More interested in collecting fees than the propriety of his audit, Quintanilla nevertheless signed off on the EGMI financial statements containing false income tax disclosures and accounting. (¶37-38.) There can be no reasonable dispute that Quintanilla knew that EGMI's Form 10-K was misleading with respect to taxes, and still issued a clean audit opinion.

### D.    Shareholders' Equity

The amounts reported in the shareholders' equity section of EGMI's balance sheet are calculated based upon the number of shares of EGMI stock outstanding. (¶175.) An auditor can easily verify the number of shares outstanding by obtaining a confirmation from the company's transfer agent. (¶176.) However, although called for by its audit programs (*id.*), MB did not obtain such confirmations during the 2007 and 2008 EGMI audits, and there is no evidence that MB took any other substantive steps to confirm the number of shares outstanding as reported by EGMI. (¶178.) This conclusion is supported by a variety of evidence, including the audit workpapers' "confirmation control logs" (which show that MB never received confirmations from the transfer agent (¶180), Schiff's assertion that members of the audit team told him that they "were prevented from contacting the Registrar/Transfer Agent and never received a transcript [of stock transactions]" (¶179), and an email MB sent to EGMI in August 2009 (shortly before a PCAOB inspection) which requested its copy of the transfer agents' year-end reports for 2006-2008 "as soon as possible" because the 2008 audit team was "unable to receive a confirmation from the stock transfer agent at year end for Electronic Game Card." (¶181.)

## VII.   <u>Quintanilla's Expert Concedes a Full Range of Violations of PCAOB Standards.</u>

Given the foregoing, it's no surprise that Quintanilla's expert witness has conceded that:

19

- "[T]here wasn't enough sufficiency of audit evidence to support any of the three years opinions." (¶182(a).)

- "I thought that the 2007 audit left a lot to be desired, and so did the 2006 audit, and so did the 2008 audit." (¶182(b).)

- Regarding the 2006 audit, the audit team did not "meet professional standards with respect to identifying fraudulent activity at EGMI," and there was not "enough work in the critical areas of revenue and asset[s] and planning," or "enough really detailed professional work in terms of – of experienced personnel performing those steps that one would have to see in each stage of these audits." "I [the expert] did not see enough evidence to support an audit opinion."  (¶182(c).)

- Regarding the 2008 audit, "[i]t was just a very sort of cursory kind of audit. It didn't really have the real guts and meat that you need in an audit. And one of the examples of this was this bank account. I mean, the confirmations weren't controlled properly, for instance. And the revenue wasn't – it wasn't properly vouched, as I recall. The receivables weren't properly confirmed. So in the totality of having enough evidence in existence to render an opinion, I would not have issued [the] report." (¶182(d).)

- The "audit failure" here "is a function of a lack of sufficient knowledge and experience in handling audits for publicly traded companies." (¶182(k).)

## VIII.   Quintanilla Received a Share of Audit Fees Paid by EGMI

During the relevant period, MB was a California Limited Liability Partnership with three audit partners and one tax partner. (¶183.) EGMI paid substantial fees to MB – $55,553 in 2006, $71,736 in 2007, and $86,889 in 2008. (¶184.) This made EGMI Quintanilla's second most important client by revenue (just behind Advance Nanotech, another Cole/Boyne company), and put EGMI on MB's list of top-ten clients. (¶185.) By late 2010, when the fraud unraveled, EGMI stopped paying MB, and MB is one of EGMI's bankruptcy creditors. (¶186.)

At MB, Quintanilla's "compensation was determined by a draw on what the partners' availability of funds or cash flow was." (¶187.) MB also made monthly payments to Quintanilla to pay off a note MB issued to Quintanilla when he joined the firm. (¶188.) During 2008 and 2009, as soon as EGMI paid audit fees to MB, MB paid off its creditors and made draw payments and payments on partner notes. *E.g.*, December 10, 2008 MB email: "We need to figure out what our

cash position is going to be to meet our next payroll and finish making up the draw payments to partners. This is what we have so far: … Electronic Game Card $16K (wire coming on 12/22);" February 4, 2009 MB email: "Rent for both offices were mailed out today. The checks for the draws, partners notes, and some A/P (urgent) are on my desk in a pink folder … . As enough money comes in to cover them; then they can be released. Ryan knows how to check the bank accounts for the pending wires to be received until I come back. Pending wires are only Amaru and Electronic Game Card." (¶¶188-189.)

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Once the moving party has identified portions of the record that show the absence of a genuine issue of material fact, the opposing party has the burden to controvert that showing. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing party cannot rely "merely on allegations or denials," but must "set out specific facts showing a genuine issue for trial." FRCP 56(e). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## ARGUMENT

**I.   <u>Quintanilla Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder.</u>**

The SEC can establish liability for securities fraud under Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act by showing that Quintanilla:

> (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.  The requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b-5, except no showing of scienter is required to obtain an injunction under Section 17(a)(2) or (a)(3).

*SEC v. Pentagon Cap. Mgmt., PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (citation omitted).  The SEC must also show that the fraud was committed through the means or instrumentalities of interstate commerce and, in order to prevail on its claim under Section 17(a)(2), the SEC must show that Quintanilla "obtain[ed] money or property by means of" his fraudulent statements or omissions. 15 U.S.C. §§ 77q & 78j(b). Irrefutable evidence establishes each of these elements.

### A.    Quintanilla Made Materially False Statements to the Investing Public.

Materially False Statements Regarding Audit Standards - There is no reasonable dispute that MB's repeated statements that "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board" were false. Quintanilla and his audit team certainly did not comply with these standards – the violations here are legion – and Quintanilla's expert has both admitted that the audits generally did not meet PCAOB standards in 2006, 2007, or 2008, and identified at least seven overarching ways in which the audits did not measure up, *i.e.*, planning, fraud review, evidential matter, supervision, proficiency, quality control, and documentation.

Audit reports on public company financial statements fall into a class of representations that is "so obviously important to the investor that reasonable minds cannot differ on the question of materiality." *SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978). Indeed, an audit report is the very thing that allows investors to rely on financial statements and assess the viability of a public company and its business model, operations, and financial condition. Simply put, MB's statements that it complied with PCAOB standards were material.

Materially False Statements Regarding GAAP - Nor is there any reasonable dispute surrounding the falsity of MB's repeated statements that EGMI's financial statements "present fairly, in all material respects, the financial position of [EGMI] … in conformity with accounting principles generally accepted in the United States of America." Quintanilla testified that he believes that "EGMI's financial statements from 2006 to 2009 were fraudulent," "those financial statements

22

contained material misstatements," and "management intentionally made material misstatements in those financial statements." (¶6.) His expert similarly concluded that "there was a fraud that took place which overstated certain items on [EGMI's] financial statements." (*Id.*) In addition, the SEC's expert thoroughly documented his conclusion that EGMI's cash, marketable securities, A/R, revenue, and common shares outstanding were materially misstated, and that EGMI omitted material disclosures concerning its taxes and related party transactions. (*Id.*) Quintanilla's expert did not state any disagreement with those conclusions. (*Id.*)

### B.   Quintanilla Engaged in a Scheme to Defraud.

In addition to making false statements, Quintanilla also engaged in a fraudulent scheme and course of conduct. The undisputed facts demonstrate that Quintanilla's work for EGMI was an extended game of avoidance, fabrication, and purported oversights. Those practices – which were distinct from representations made in Mendoza Berger's audit opinions, yet key to ensuring that EGMI's fraud was kept secret – comprised a scheme to defraud. *See Pentagon*, 725 F.3d at 285 (misrepresentation and scheme liability claims may coexist where defendant "went beyond making misrepresentations, taking 'a series of actions over several years to implement a scheme that he devised'" (quoting *VanCook v. SEC*, 653 F.3d 130, 139 (2d Cir. 2011)); *SEC v. Tourre*, 2014 WL 61864, at *5 (S.D.N.Y. Jan. 7, 2014) (upholding scheme liability verdict where "SEC alleged an array of supporting conduct by [the defendant] that was designed and geared in a myriad of ways to support" the defendant's misstatements).

Over the course of three EGMI engagements (for the 2006, 2007, and 2008 fiscal years), Quintanilla demonstrated an unwavering commitment to *not* auditing EGMI's financial statements. Sleepwalking through those engagements, he omitted fundamental audit steps that were required by PCAOB standards and called for by his team's own planning documents; disregarding common sense and PCAOB standards, he repeatedly permitted EGMI to control the audit confirmation

process; he accepted purportedly corroborating evidence from EGMI management without examining it in detail, and certainly without the "professional skepticism" required of auditors; he noted and then failed to properly pursue each of the multiple signs of fraud that was highlighted for him by his staff; and he modified and backdated audit workpapers on the eve of a PCAOB inspection (months after the audit report was issued) and instructed his subordinates to do the same. Collectively, these efforts to create the pretense of an audit without actually conducting one – as distinct from the misstatements in the audit reports he authorized – comprised a scheme to defraud.

### C.   Quintanilla Obtained Money or Property by Means of His Untrue Statements.

Section 17(a)(2) of the Securities Act prohibits "directly or indirectly … obtain[ing] money or property by means of" untrue statements or omissions.  As this Court has noted, "[t]he case law applying Section 17(a)(2) splits over how to interpret 'obtain,'" in particular, with respect to whether a defendant must personally obtain money or property. *SEC v. Syron*, 934 F.Supp.2d 609, 638 (S.D.N.Y. 2013). The SEC should prevail on its Section 17(a)(2) claim under either standard.

The funds in EGMI's coffers were obtained through deceit – the entire entity was a fraud-riddled shell that Cole and Boyne utilized to perpetrate a stock offering scheme.  There can be no reasonable dispute that Cole and Boyne used those funds to hire and pay MB to *not* audit EGMI's financial statements: a real audit would have exposed Cole and Boyne's scheme and EGMI's stock (which laid the scheme's golden eggs) would have been delisted and lost its value. There is also irrefutable evidence that MB used the ill-gotten "audit" fees from EGMI to pay Quintanilla's draw and repay his note, *e.g.*, on December 10, 2008, MB was preparing to make "draw payments to partners" with "Electronic Game Card['s] $16K" fee payment, and on February 4, 2009 (during the 2008 audit season) "checks for draws [and] partner notes" were paid with "wires [from] … Electronic Game Card."

24

Thus, under either reading of Section 17(a)(2), Quintanilla obtained money or property because: (1) EGMI used MB audit reports to further its offering fraud, (2) MB obtained fees from EGMI through its fraudulent audits, (3) MB compensated Quintanilla for conducting those so-called audit; and (4) the specific audit fees that EGMI paid to MB were distributed to Quintanilla.

### D.     Quintanilla Exercised Authority over Mendoza Berger's Audit Reports.

As the engagement partner with "ultimate responsibility" for all three of the MB audit opinions at issue, Quintanilla was responsible for those opinions' misstatements. *See SEC v. KPMG*, 412 F.Supp.2d 349, 375-76 (S.D.N.Y. 2006) (holding that engagement partner could be liable for firm's misstatements; "[such partners] should be deemed to have made the misstatements"); *cf. Pfizer Inc. Sec. Litig.*, 936 F.Supp.2d 252, 268-69 (S.D.N.Y. 2013) (denying motion to dismiss under "*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)); *In re Fannie Mae* 2008 Sec. Litig., 891 F.Supp.2d 458, 473 (S.D.N.Y. 2012) (same).

### E.     Quintanilla Acted with the Requisite State of Mind.

Quintanilla acted with scienter, which includes knowing or reckless conduct.  *E.g.*, *KPMG*, 412 F.Supp.2d at 378 ("The Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b) ….."). With respect to an auditor, scienter may established by a showing that "'defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects;'" defendant used "'shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it,'" defendant's "'accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments … were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'" *Id.* (quoting

*McLean v. Alexander*, 599 F.2d 1190, 1198 (3rd Cir. 1979) and *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992)).

The scienter evidence against Quintanilla takes many forms. These include: (1) his lead role in covering up MB's sham audits by backdating, modifying, and supplementing the audit workpapers for purposes of a PCAOB inspection; (2) the breadth of his failures to comply with overarching PCAOB standards in virtually all categories, *i.e.*, planning, fraud review, proficiency and supervision, evidential matter, documentation, and professional skepticism; (3) the duration and size of EGMI's financial statement fraud, (4) the fact that the fraud and/or audit deficiencies were immediately apparent to people who surrounded Quintanilla and had access to the same information that he did, including junior, unlicensed staffers and EGMI's new CFO, and (5) the fact that Quintanilla knew what he was doing, *i.e.*, he took and passed a notoriously rigorous uniform exam and met the experience requirements to obtain a CPA license and, during the relevant time, had been practicing for over 15 years, advertised that he had experience "dealing with large SEC reporting corporations," and claimed a "core competenc[y] in the area of audits, reviews and compilations of both closely held and public companies."

Perhaps even more damning is Quintanilla's egregious refusal to see the obvious or investigate the doubtful when confronted with: (1) CS bank statements in Microsoft Word format, (2) other CS bank statements that didn't add up, (3) other bank statements that didn't match (and proved the falsity of) the company's general ledger (with differences in the hundreds of thousands of dollars), (4) bank confirmations that came in after the audit report was issued and that didn't match the cash balance reported by the company (again, with differences in the hundreds of thousands of dollars), (5) EGMI's failure to produce bank reconciliations; (6) EGMI's unexplained (and unexamined) $589K journal entry to cash; (7) A/R confirmations from the wrong customers, (8) offshore, Gibraltar-based customers whose very existence couldn't be confirmed by MB; (9)

balances that inexplicably summed up even though they were reported to MB in variously denominated currencies without conversion to U.S. dollars; (10) EGMI's failure to pay taxes, which so obviously put the lie to the company's tax-related financial statement footnote disclosures; (11) the fact that MB was "prevented from contacting [EGMI's] Registrar/Transfer Agent and never received" confirmations of the number of EGMI shares of stock outstanding for two audit years. In the face of all these fraud indicators, not once did Quintanilla apply added scrutiny or ratchet up his audit procedures, as required by PCAOB standards.

"Shoddy accounting practices," "a pretend audit," the "flimsy"-est of grounds for EGMI's and MB's representations, "practices so deficient that the audit amounted to no audit at all," "an egregious refusal to see the obvious, or to investigate the doubtful" – these phrases perfectly describe Quintanilla's "audits" because he acted with scienter.

Negligence - The facts supporting scienter also satisfy the lower negligence standard the SEC must satisfy to prevail on its claims under Sections 17(a)(2) and (3) of the Securities Act. Negligence can also be established by showing a failure to comply with the applicable standard of care, which for public company auditors is established by the PCAOB's auditing standards. *See Dearlove v. SEC*, 573 F.3d 801, 804 ("the appropriate standard of care in this case [the defendant was a public company auditor] is GAAS"); SOX §2(a)(10) (defining "professional standards" for audits to mean those established by the PCAOB). Quintanilla's countless violations of PCAOB standards, as discussed above and conceded by Quintanilla's own expert, therefore also establish his negligence.

### F.    The Evidence Establishes the Remaining Elements of Securities Fraud

In connection with - Quintanilla committed fraud in connection with the purchase or sale, and in the offer or sale, of EGMI securities because his fraudulent conduct took place within "the entire selling process." *U.S. v. Naftalin*, 441 U.S. 768, 773, 778-79 (1979) ("[Section 17(a)] was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an

initial distribution or in the course of ordinary market trading."); *See SEC v. Ramoil Mgmt., Ltd.*, 2007 WL 3146943, at *9 (S.D.N.Y. Oct. 25, 2007) (annual report's representations that financial statements had been audited and that company was financially sound were "in connection with the purchase and sale, and the offer or sale" of company's securities).

Interstate Commerce – Quintanilla committed fraud by the use of various means and instrumentalities of interstate commerce because he used phone calls, email, and wire transfers, and travelled domestically and internationally, to carry out the so-called audits and interim reviews of EGMI.  *E.g.*, *Ramoil Mgmt.*, 2007 WL 3146943, at *8 (email); *SEC v. 800america.com, Inc.*, 2006 WL 3422670 at *8 (S.D.N.Y. 2006) (wires); *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 861, 865 (S.D.N.Y. 1997) (wire transfers).  Any of these acts alone suffices to satisfy the interstate commerce element of the Commission's fraud claims.

## II. Quintanilla Aided and Abetted Mendoza Berger's Violations of Section 10(b) of the Exchange Act.

To state an aiding and abetting cliam, the SEC must show (1) a primary violation, (2) defendant's knowledge of such violation, and (3) defendant's substantial assistance in such violation. *E.g.*, *Syron*, 934 F.Supp.2d at 634. By and through the conduct described above, MB committed securities fraud through false statements in its audit reports. Quintanilla had knowledge of those violations because of his intimate familiarity with (1) MB's audits of EGMI, (2) the wide range of red flags encountered during those audits, and (3) MB's failure to conduct a PCAOB-compliant audit and form a valid basis for its audit reports. Quintanilla's substantial assistance is established by his position as the engagement partner with "final responsibility" who "supervised and signed off on EGMI's audits" and participated in and supervised the modification and backdating of MB's workpapers. Quintanilla therefore aided and abetted MB's primary violations of Section 10(b).

**III.   Quintanilla Aided and Abetted Mendoza Berger's Violations of
Sections 10A(a)(1) and 10A(b)(1) of the Exchange Act.**

Section 10A(a)(1) of the Exchange Act requires that audits include procedures designed to assure the detection of illegal acts that would directly and materially impact public companies' financial statements. Section 10A(b)(1) dictates steps that an auditor must take upon "detect[ing] or otherwise becom[ing] aware of … information indicating that an illegal act … may have occurred," including reporting the act to the audited company's management or board of directors.

It is beyond dispute that MB violated both provisions: it failed to implement audit procedures to appropriately scrutinize numerous fraud indicators at EGMI and failed to respond (*e.g.*, by confronting management or informing the board) as required by Section 10A(b)(1). As noted previously, Quintanilla knowingly played a substantial role in determining the procedures followed during MB's purported audits of EGMI and in its failed responses to many indicia of fraud that were noted by the staff he supervised. Through that conduct and pursuant to Section 20(e) of the Exchange Act, he aided and abetted the firm's violations of Section 10A(a)(1) and 10A(b)(1).

## CONCLUSION

For the reasons discussed herein, the Commission respectfully requests that the Court grant its motion for summary judgment on the foregoing claims against Defendant Quintanilla.

Dated: April 29, 2012  
   New York, New York

Respectfully submitted,

/s/ Aaron P. Arnzen  
Aaron P. Arnzen (AA4323)  
Senior Trial Counsel  
SECURITIES AND EXCHANGE COMMISSION  
New York Regional Office  
3 World Financial Center, Room 400  
New York, NY 10281-1022  
(212) 336-0573 (Arnzen)  
arnzena@sec.gov