UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————

No. 12-cv-8167 (RJS)

———————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

LEE COLE, *et al.*,

Defendants.

———————————————

OPINION AND ORDER
September 22, 2014

———————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against Defendants Lee Cole ("Cole") and Linden Boyne ("Boyne" and, with Cole, the "Defendants") for violations of numerous federal securities laws. (Compl., Doc. No. 1.)[1]  The Court previously entered default judgment against Defendants on the SEC's allegations that the pair had violated various provisions of the Securities Act of 1933, the Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, and the associated rules promulgated thereunder.  (*See* Default Judgment, Doc. No. 87 ("Default Judgment"), at 6 (finding liability on Claims 1–3, 5, 7–15, and 18 of the Complaint).)  As part of the Default Judgment, the Court directed the SEC to propose and justify the relief that should be granted based on Defendants' liability. (*Id*. at 6.)  Consistent with that instruction, the SEC now moves for relief, seeking disgorgement, civil fines, and several permanent injunctions.  (Mot. for Relief, Doc. No. 93 ("Mot."), at 1–2.)  For the reasons set forth below, the Court

---

[1] The SEC also filed suit against Defendants Timothy Quintanilla ("Quintanilla") and Kevin B. Donovan ("Donovan"), who are not relevant to the instant motion.  (*See* Compl.)  The SEC recently filed a motion for summary judgment against Quintanilla (Doc. No. 118), and Quintanilla filed a cross-motion for summary judgment against the SEC (Doc. No. 126).  Donovan already consented to entry of a Final Judgment without admitting or denying allegations of the Complaint.  (Doc. No. 89.)  The Court's references to "Defendants" in this Opinion and Order do not include Quintanilla or Donovan.

grants the SEC's motion.

I. BACKGROUND

Because the history of the case is set out in detail in the Court's Default Judgment (*see* Default Judgment at 1–5), the Court provides only a brief summary here.

The SEC commenced this action by filing a Complaint on November 8, 2012. (*See* Compl.) According to the Complaint, between 2006 and 2009, Defendants served as CEO and CFO of Electronic Game Card, Inc. ("EGMI"), a publicly-owned company. (*Id.* ¶ 1.) During that period, Defendants, *inter alia*, lied to the investing public about the operations and financial status of EGMI in order to inflate EGMI's stock price and "secretly funnel[ed] millions of shares of EGMI stock to Gibraltar-based entities they secretly controlled (the "Gibraltar Entities")." (*Id.* ¶¶ 1–3.)

During discovery, Defendants failed to comply with five Court Orders (*see* Default Judgment at 2–5), including one to appear for a deposition (Doc. No. 71) and one to pay sanctions totaling $1,500.00 (Doc. No. 73). On August 6, 2013, the Court held a hearing to address whether default judgment should be entered against the pair. (*See* Default Judgment at 5.) Defendants did not appear at the hearing. (*See id.*) Two days later, the Court entered default judgment in favor of the SEC with respect to liability on the violations listed above. (*See id.* at 6.)

On October 1, 2013, the SEC filed the instant motion and memorandum of law seeking civil fines, permanent injunctions, and either disgorgement or reimbursement. (*See* Mem. of Law in Supp. of Mot., Doc. No. 94 ("Mem."), at 1–2.) The SEC's submission also included a declaration from Stephen A. Larson, attached to which were 46 exhibits establishing links between Defendants, their affiliates, and eleven Gibraltar Entities. (Decl. of Stephen A. Larson, dated Oct. 1, 2013, Doc. No. 96 ("Decl." or the "Declaration").) On or about October 8, 2013, Defendants submitted their responses, denying that they committed the violations and asserting that they "have cooperated as best as they were able."[2] (Obj. to Mot., dated Oct. 8, 2013, Doc. No. 125 ("Obj."), at 4–5, 36–37.) They further insisted that the SEC had not "furnished factual proof" of the violations, and they blamed their failure to abide by the Court's various Orders on "jurisdictional conflict[s] of law," declining to elaborate further. (*Id.* at 5–6, 38.) To date, Defendants have not filed a motion to set aside or vacate the default judgment, as is permitted by Federal Rules of Civil Procedure 55(c) and 60(b).

II. DISCUSSION

As a threshold matter, the Court notes that a default judgment, unless vacated, is "final" and authorizes the Court to grant a plaintiff "any relief to which the [C]ourt decides [plaintiff] is entitled." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). As part of a default judgment, the Court accepts as true "all of the factual allegations of the complaint, except those relating to damages." *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). With respect to the substance of the instant motion, the SEC seeks (1) disgorgement or, in the alternative, reimbursement under Section 304 of the Sarbanes-Oxley Act; (2) civil fines; and (3)

---

[2] Defendants mailed their responses to the Court on or about that date, sending separate, but otherwise identical, responses. (*See* Doc. No. 125.) The SEC was aware of these documents, which were referenced in its reply brief. (*See* Doc. No. 97.) However, the responses were not properly docketed until May 28, 2014.

injunctive relief barring Defendants from (a) further violating the securities laws, (b) acting as an officer or director of a public company, and (c) participating in activities involving penny stocks.  (*See* Mem. at 1–2.)  The Court addresses each request in turn.

### A. Disgorgement

The SEC argues that Defendants should disgorge their "ill-gotten gains" and pay prejudgment interest.  (*See* Mem. at 1, 4–8.)  For the reasons set forth below, the Court finds that Defendants jointly and severally are liable for disgorgement in the amount of $14,670,732.99.

#### 1. Legal Standard

The Court has "broad equitable power to fashion appropriate remedies [for violations of federal securities law], including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). "Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014); *see also SEC v. Amerindo Inv. Advisors Inc.*, No. 05-cv-5231 (RJS), 2014 WL 2112032, at *4 (S.D.N.Y. May 6, 2014) (noting that disgorgement is "meant to deter wrongdoing by forcing a defendant to give up the amount he was unjustly enriched" (citation and internal quotation marks omitted)).

The Court engages in "factfinding . . . to determine the amount of money acquired through wrongdoing," and then issues "an order compelling the wrongdoer to pay that amount plus interest . . . ." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). "To determine the amount of money acquired through wrongdoing, courts apply a two-part burden shifting framework." *Amerindo*, 2014 WL 2112032 at *4. First, the SEC – the agency seeking disgorgement – must "show that its calculations reasonably approximate[] the amount of the defendant's unjust gains." *Id.* (citation and internal quotation marks omitted). After the SEC clears that threshold, the burden of proof then shifts, so that a defendant seeking to avoid disgorgement must show that the SEC's estimate was "inaccurate, or that some of the gains were not the result of wrongdoing." *Id.* (citations and internal quotation marks omitted). The defendant's burden of proof is "high," because "any risk of uncertainty falls on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (citation and internal quotation marks omitted).

"As part of the disgorgement judgment, a Court may order a defendant to pay prejudgment interest to prevent[] [the] defendant from obtaining the benefit of what amounts to an interest free loan." *Id.* at *5. (citation and internal quotation marks omitted).  The Court has discretion regarding whether to charge interest and in setting the interest rate. *Id.* In exercising that discretion, the Court should consider "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and the relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant." *First Jersey Sec.*, 101 F.3d at 1476.  With respect to setting the interest rate in securities cases, courts generally have found the IRS late-payment annual rate ("underpayment rate") to be appropriate. *See, e.g.*, *id.*

3

2. Application

The SEC calculates Defendants' wrongful gain, without interest, to be $12,345,908.74. (*See* Decl. ¶ 51.) This amount is equal to the revenue from Defendants' illicit transfers, through the eleven Gibraltar Entities, of approximately 19 million shares of EGMI stock between January 2006 and October 2009. (*See id.* ¶¶ 40–50.)

The SEC supports this calculation with evidence, including brokerage statements from the Gibraltar Entities, which links Defendants to the Gibraltar Entities and reflects the revenue amassed by them. (*See id.* ¶¶ 4, 40–50.) Since Defendants have defaulted, it is undisputed that Defendants violated numerous securities laws by directing stock to these Gibraltar Entities for the purpose of illegally raising EGMI stock prices through "persons and entities associated with Cole and Boyne." (Compl. ¶¶ 22–42, 71–80, 85–87, 91–127, 138–41.) Consistent with the nature of Defendants' violations, the SEC's records show that Andrew Turner, Cole's brother-in-law and personal assistant, and John Lister, the Defendants' Gibraltar-based business associate, were connected to at least ten of the eleven Gibraltar Entities. (*See* Decl. ¶ 4). With regards to the remaining Gibraltar Entity, as well as two others, the SEC's documentation establishes direct links to Boyne. (*See id.*)

To determine the amount of revenue amassed through Defendants' wrongdoing, the SEC aggregated the EGMI stock transfers from the eleven Gibraltar Entities, which is reflected in following Table. (*See* Decl. ¶¶ 39–51.)

| **Entity** | **EGMI Shares** | **Revenue** | **Dates** |
|---|---|---|---|
| Alms | 400,000 | $453,690.80 | 06/09 |
| Atlantic Business Services | 116,577 | $138,606.55 | 12/07 – 09/09 |
| Bradwall | 2,195,324 | $2,166,683.42 | 05/09 – 09/09 |
| Broaden Solutions | 1,080,000 | $371,830.64 | 12/08 – 01/09 |
| Capital Growth | 5,363,730 | $1,926,504.14 | 08/06 – 12/08 |
| EEBS | 2,450,150 | $1,934,224.41 | 01/09 – 09/09 |
| Greenfield Capital International | 1,500,000 | $720,000 | 08/08 |
| IT Properties | 1,897,639 | $1,426,911.53 | 01/06 – 06/09 |
| Kingsley Holdings International | 808,823 | $1,220,197.54 | 10/09 |
| Main Line Securities | 3,114,466 | $1,591,368.57 | 07/07 – 02/08 |
| Tenyham | 250,000 | $395,891.14 | 10/09 |

Because Defendants have failed to cooperate with discovery requests (*see* Default Judgment at 2–5), the Court does not have other records to make a better approximation of the assets to be disgorged. In any event, the Court need not attempt such an approximation. *Cf. SEC v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) (noting that where ill-gotten gains are commingled with legitimate proceeds, "the SEC is not required to trace specific funds to their ultimate recipients . . . [because]

4

disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset" (citation and internal quotation marks omitted)). The SEC's proffered records, together with the Default Judgment Order, provide sufficient circumstantial evidence to calculate the disgorgement amount. Accordingly, the Court finds that $12,345,908.74 is a "reasonable approximation of profits . . . connected to the violation." *Patel*, 61 F.3d at 139.

The SEC also seeks prejudgment interest on the above gains, and calculates such interest using the IRS underpayment rate. (*See* Mem. at 7–8.) The SEC calculates that Defendants owe $2,324,842.25 in prejudgment interest accruing from the dates of the stock transfers at issue through August 31, 2013. (Decl. ¶ 52, Ex. 46.) The Court accepts the accrual date for the SEC's calculations, holds that the calculations are reasonable, and finds that the SEC has met its burden.

For their part, Defendants "have not shown that the SEC's figures are inaccurate or that any of the gains were legally-derived . . . ." *Amerindo* 2014 WL 2112032 at *9. Because Defendants provided no formal evidence in their responses to counter the SEC's findings, and because they simply denied wrongdoing without seeking relief from the Default Judgment Order (*see* Obj. at 3–7, 35–40), Defendants have not met their burden of proof to avoid disgorgement. Accordingly, the Court approves the SEC's calculations. Including interest, Defendants shall be jointly and severally liable for a total of $14,670,750.99 in disgorgement. *See SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) ("Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement."), *aff'd*, 438 F. App'x 23 (2d Cir. 2011); *see also SEC v. Boock*, No. 09-cv-8261 (DLC), 2012 WL 3133638, at *3 (S.D.N.Y. Aug. 2, 2012) (finding that joint and several liability is "particularly appropriate" when apportionment between defendants "is difficult or even practically impossible because . . . defendants have engaged in complex and heavily disguised transactions in an effort to conceal their fraud" (citation and internal quotation marks omitted)).[3]

### B. Civil Penalties

The SEC argues that each Defendant should pay civil penalties. (Mem. at 8–10.) For the reasons set forth below, the Court agrees and finds that each Defendant should pay $7,500,000.00 in fines.

### 1. Legal Standard

When a defendant violates the federal securities laws, a court may impose civil fines on him or her based on a three-tiered system. *See* 15 U.S.C. §§ 77t(d)(2) (Securities Act), 78u(d)(3)(B) (Exchange Act). The statute reserves the highest, or third-tier, penalties for violations "involv[ing] fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). A court shall set the

---

[3] Having ruled in favor of the SEC on disgorgement, the Court declines to address the SEC's alternative request for reimbursement of stock profits under Section 304 of the Sarbanes-Oxley Act. (*See* Mem. at 2.)

5

maximum fine, which is the higher of (1) $100,000 for each violation by a natural person, or (2) "the gross amount of pecuniary gain to such defendant." *Id*.

With some exceptions, a "defendant's gross amount of pecuniary gain is similar to" the disgorgement amount. *Amerindo*, 2014 WL 2112032 at *11. Unlike disgorgement, the calculation of "gross amount of pecuniary gain" is limited to gains within the five-year statute of limitations. *See Gabelli v. SEC*, 133 S. Ct. 1216, 1220–21 (2013) (interpreting 28 U.S.C. § 2462, the statute of limitations for lawsuits involving frauds that are difficult to detect). Civil penalties, unlike disgorgement, may not be imposed jointly and severally. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287–88 (2d Cir. 2013). "Nevertheless, where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's [gross amount of pecuniary] gain may be the total gains obtained by the group through that defendant's violations." *Amerindo*, 2014 WL 2112032 at *11. Moreover, because such civil penalties are punitive in part, *see Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006), "it makes sense to hold each defendant responsible for all wrongful gains from the scheme without allowing one defendant's payment of a fine to reduce others' punishment. . . . [M]ultiple defendants can, and often do, each benefit from the same dollar of gain," *Amerindo*, 2014 WL 2112032 at *11, n.11.

"Beyond setting maximum penalties, the statutes leave the actual amount of the penalty . . . up to the discretion of the district court." *SEC v. Razmilovic,* 738 F.3d 14, 38 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also* 15 U.S.C. §§ 77t(d)(2)(A) ("The amount of the penalty shall be determined by the court in light of the facts and circumstances."), 78u(d)(3)(B)(i) (same). In determining the fine, a court may consider many factors, none of which is dispositive. *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003). These factors include:

> (1) the egregiousness of the violations at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*Id.*

### 2. Application

Third-tier penalties are appropriate here because Defendants' numerous violations "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violations caused "substantial losses or created a significant risk of substantial losses . . . to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). Defendants failed to file required financial reports, falsified accounting and financial records, and made false statements to auditors and the SEC. (*See, e.g.*, Compl. ¶¶ 23, 25, 27–32; *see also* Mem. at 2.) The investors' losses were also significant, because EGMI once had over $150 million in market capitalization and is now bankrupt. (*See* Compl. ¶ 2; Mem. at 9.)

6

A third-tier penalty may be set as high as the gross amount of pecuniary gain. The disgorgement amount – $14,670,750.99 – is a helpful starting point to calculate the gross amount. *See Amerindo*, 2014 WL 2112032 at *11 (finding that a defendant's gross amount of pecuniary gain generally is similar to defendant's disgorgement amount). Still, the Court must adjust this figure, since the calculation must be limited to gains from fraud committed on or after November 8, 2007, five years before the filing of the instant action, *see Gabelli*, 133 S. Ct. at 1220–21, whereas the disgorgement figure includes gains from fraudulent stock transfers dating back to January 2006 (*see* Decl. ¶¶ 40–51). Properly calculated, the gross amount of pecuniary gain – the maximum third-tier penalty – to each Defendant is $12,179,941.23. To reach this conclusion, the Court deducted $1,912,544.83 – the value of the stock transfers that occurred outside the statute of limitations period – from $12,345,908.74 – the total amount of fraudulent transfers dating back to January 2006 – for a total of $10,433.363.91.[4] (*See id.*) To adjust the prejudgment interest accordingly, the Court subtracted $578,264.93 – the interest accrued from sales that occurred from January 2006 through the end of November 2007 – from $2,324,842.25 – the total interest accrued from all the sales dating back to January 2006 – for a remainder of $1,746,577.32 in prejudgment interest. (*See id.* ¶ 52.) Thus, the total amount of gains illegally derived during the statute of limitations period – $10,433.363.91 in fraudulent stock transfers – plus $1,746,577.32 in prejudgment interest, yields a maximum third-tier penalty of $12,179,941.23. Moreover, this figure is the maximum for each Defendant, since "close cooperation between [D]efendants [suggests that] . . . the best calculation of each [Defendant's] gain is the total gain to the scheme generated by each's wrongdoing." *Amerindo*, 2014 WL 2112032 at *11.

Exercising its discretion in setting a fine within the statutory range, the Court considers the above-referenced *Lybrand* factors and finds that the first, second, fourth, fifth, and sixth factors weigh heavily in favor of imposing severe civil penalties. *See Lybrand*, 281 F. Supp. 2d at 730. Defendants' conduct cost investors millions of dollars (*see* Compl. ¶ 2; Mem. at 9), yet Defendants have failed to admit wrongdoing (*see* Obj. at 5, 38). In addition, Defendants have been "willful[ly] disobedien[t]" throughout this litigation. (Default Judgment at 6.) They refused to cooperate with discovery and "wasted the [SEC's] and this Court's time with their seemingly endless, but ultimately spurious, excuses." (Mem. at 9; *see also* Default Judgment at 6 ("Defendants have remained unmoved and noncompliant, grinding this litigation to a halt.").) The egregiousness of their conduct and lack of cooperation with the Court warrant a severe third-tier civil penalty. *See Lybrand*, 281 F. Supp. 2d at 730. Defendants argue that they have been cooperative and that it is implausible that they have the necessary funds to pay the fines. (*See* Obj. at 21, 54.) Otherwise, they claim, they would not be representing themselves *pro se*. (*Id.*) Needless to say, the Court remains deeply skeptical of Defendants' purported inability to pay a fine, and ultimately is unpersuaded by Defendants' arguments. Defendants

---

[4] To conclude that stock transfers totaling $1,912,544.83 occurred outside the statute of limitations, the Court added the following figures: Capitol Growth Limited sold shares totaling $650,285.41 from August 2006 to August 2007 (*see* Decl. ¶ 44, Ex. 38); IT Properties, $149,249.27 from January 2006 to March 2007 (*see id.* ¶ 46, Ex. 40); and Main Line Securities Limited, $1,113,010.15 from July 2007 to November 2007 (*see id.* ¶ 48, Ex. 42).

participated in a multimillion-dollar securities fraud scheme and profited from the illegal proceeds. (Default Judgment at 6; Compl. ¶¶ 22–26.) Furthermore, Defendants have offered no financial records to substantiate their alleged inability to pay fines. *See SEC v. Anticevic*, No. 05-cv-6991 (KMW), 2010 WL 2077196, at *8 (S.D.N.Y. May 14, 2010) (declining to limit defendant's liability because "information regarding his net worth has been rendered unavailable by his absconding"). Accordingly, the Court finds that imposing civil penalties is appropriate, and that "a harsh penalty is necessary to reflect the seriousness of the violations, to account for the [Defendants'] subsequent behavior, and to deter others from considering following in the [Defendants'] path." *Amerindo*, 2014 WL 2112032 at *11. Based on the totality of the circumstances and all of the *Lybrand* factors, the Court imposes a civil fine of $7,500,000.00 against each Defendant.

### C. Injunctions Against Defendants

The SEC requests that the Court order injunctive relief prohibiting Defendants from (1) violating securities laws in the future (*see* Mem. 2–4), (2) serving as officers or directors of a public company (*see id.* at 10–11), and (3) participating in activities involving the offering of penny stocks (*see id.* at 11–12). For the reasons set forth below, the Court grants such relief.

#### 1. Committing Future Securities Violations

The SEC may seek permanent injunctive relief for violations of the Securities Act and Exchange Act. *See* 15 U.S.C. §§ 77t(b) (Securities Act), 78u(d)(1) (Exchange Act). The Court must grant such relief if the defendant has violated the securities laws and there is a "reasonable likelihood that the wrong will be repeated." *Amerindo*, 2014 WL 2112032 at *13. In determining reasonable likelihood, courts are directed to consider "the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an isolated occurrence; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citation and internal quotation marks omitted).

The Court finds that granting a permanent injunction here is appropriate. As stated above, Defendants were found to have misrepresented securities information repeatedly in SEC disclosures. Moreover, because they have reaped enormous rewards from their fraud and maintain that they are blameless, there is a reasonable likelihood of repeat violations. The Court therefore imposes a permanent injunction to deter against potential future harms inflicted by Defendants.

#### 2. Officer and Director Bar

The Court may permanently or temporarily bar a violator of the securities laws from serving as an officer or director of any public company if the violator's "conduct demonstrates unfitness to serve" as such an official. 15 U.S.C. §§ 77t(e), 78u(d)(2). In determining whether to impose such a bar, the Court considers: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. Bankosky*,

8

716 F.3d 45, 48 (2d Cir. 2013). Defendants' actions here merit an officer and director bar. The Court already has noted above that the first, second, fourth, and sixth factors cut strongly against Defendants. Moreover, Defendants, as heads of EGMI, were instrumental in encouraging the stock sale. (*See* Compl. ¶¶ 1–2.) They and their affiliates have multiple connections with the Gibraltar Entities, and Defendants had leadership roles in the fraud. (*See id.*) As for the fifth factor, Defendants had a significant economic stake in the violation as they helped sell $12,345,908.74 in shares of their company's stock. (*See* Decl. ¶ 51.) The Court easily finds that Defendants' conduct demonstrates unfitness to serve. *See* 15 U.S.C. §§ 77t(e), 78u(d)(2). The egregiousness of the acts merits a permanent injunction, which the Court now imposes.

### 3. Penny Stock Bar

Defendants' actions also merit a penny stock bar. Penny stocks are equity securities that cost less than five dollars. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007). "The standard of imposing such a bar essentially mirrors that for imposing an officer-or-director bar." *Id.* Having found that an officer and director bar is warranted, the Court also permanently enjoins Defendants from participating in penny stock sales, trades, and related activities.

### III. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT the SEC's motion for penalties and remedies is GRANTED. IT IS FURTHER ORDERED THAT Defendants be jointly and severally liable for $14,670,750.99 in disgorgement. IT IS FURTHER ORDERED THAT Defendants each shall be liable for $7,500,000.00 in civil fines pursuant to 15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii). IT IS FURTHER ORDERED THAT Defendants are enjoined permanently from violating the securities laws, serving as officers or directors of any public company, and participating in any activities involving the offer of penny stocks.

The Clerk of the Court is respectfully directed to terminate the motion at docket number 93.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 22, 2014
New York, New York

\* \* \*

Plaintiff is represented by Aaron P. Anzen, Securities and Exchange Commission, 44 Montgomery Street, 26th Floor, San Francisco, CA, 94104; and Andrew M. Calamari, Michael D. Paley, and Stephen A. Larson, Securities and Exchange Commission, 3 World Financial Center, Room 400, New York, NY 10281.

Defendants are proceeding *pro se*.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-22-14

<u>A copy of this Opinion and Order was
mailed to</u>:


Lee Cole
biofinance@aol.com

Linden Boyne
lboyne@aol.com
linden.boyne@sterlingfcs.com